IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RANDY BAUMBERGER, DON
EKMAN, and BRUCE GIESBRECHT,                    CV. 05-1108-PK  (LEAD)
                Plaintiffs,

v.


HOLLYWOOD ENTERTAINMENT
CORPORATION,
                Defendant.
_____

MARK PERKINS,
                Plaintiff,                    CV. 05-1452-PK
                                  (CONSOLIDATED)
v.
                                  FINDINGS AND
HOLLYWOOD ENTERTAINMENT                    RECOMMENDATION
CORPORATION, MOVIE GALLERY,
INC.,and  JOE THOMAS MALUGEN,
                Defendants.
_____

PAPAK, Magistrate Judge:

       Plaintiffs Randy Baumberger ("Baumberger"), Don Ekman ("Ekman"), Bruce Giesbrecht

("Giesbrecht"), and Mark Perkins ("Perkins") are former employees of defendant Hollywood

Entertainment Corporation ("Hollywood").  After a change in ownership of Hollywood, plaintiffs either quit or were terminated.  Plaintiffs dispute the terms of a severance plan that was in effect at the time their employment ended at Hollywood.  Plaintiffs brings claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. and, in the alternative, under state law for failure to pay wages due and owing upon termination, and breach of contract.  In the consolidated case, in addition to the aforementioned ERISA and state law claims, Perkins brings a a state law claim for failure to pay accrued vacation wages and a common law claim of breach of the duty of good faith and fair dealing for failure to pay severance wages against Hollywood.  Perkins also brings a claim of tortious interference with economic relations against defendants Movie Gallery, Inc. ("Movie Gallery") and Joe Thomas Malugen ("Malugen"), Chief Executive Officer of Movie Gallery.

In the lead case, Baumberger, Ekman and Geisbrecht ("the Baumberger plaintiffs") move for summary judgment on all their claims against Hollywood.[1]  Defendants Hollywood, Movie Gallery, and Malugen move to dismiss all plaintiffs' state law claims and move to strike Perkins' demand for punitive damages and for a jury trial.  Defendants Hollywood, Movie Gallery and Malugen also move for summary judgment on Perkins' claim against Movie Gallery and Malugen for tortious interference with economic relations, and on Perkins' claim against Hollywood for violation of state wage law based on failure to pay accrued vacation wages.  After staying the Baumberger plaintiffs' motion for summary judgment to allow time for discovery to proceed, oral argument was heard on these motions on June 26, 2006.  For the reasons set forth

---

[1]Plaintiff Perkins does not move for summary judgment though he acknowledges that the claims he shares in common with the Baumberger plaintiffs will be decided on their motion.

PAGE 2 - FINDINGS AND RECOMMENDATION

below, summary judgment should be denied to the Baumberger plaintiffs, defendants' motion to

dismiss plaintiffs' state law claims should be granted, summary judgment should be granted to

defendants on Perkins' claim for failure to pay accrued vacation wages and should be denied as

moot for Perkins' claim of tortious interference.  Defendants' motion to strike Perkins' demand

for a jury trial and punitive damages should be granted.

## LEGAL STANDARDS

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits, if any, show there is

no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); Bahn v. NME Hospitals, Inc.,

929 F.2d 1404, 1409 (9th Cir. 1991).

The moving party carries the initial burden of proof.  The party meets this burden by

identifying portions of the record on file which demonstrate the absence of any genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  Once the initial burden is

satisfied, the burden shifts to the nonmoving party to demonstrate through the production of

probative evidence that there remains an issue of fact to be tried.  Id.

The court must view the evidence in the light most favorable to the non-moving party.

Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt

as to the existence of a genuine issue of fact should be resolved against the moving party.

Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976).  The inferences drawn from the underlying

facts must be viewed in the light most favorable to the party opposing the motion.  Valadingham

v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  Where different ultimate inferences may be

drawn, summary judgment is inappropriate.  Sankovich v. Ins. Co. of N. America., 638 F.2d 136,

PAGE 3 - FINDINGS AND RECOMMENDATION

140 (9th Cir. 1981).

## FACTUAL BACKGROUND

Plaintiffs were all employed by Hollywood in different capacities.  Until May 31, 2005, Ekman was Executive Vice President and General Counsel.  Until April 28, 2005, Giesbrecht was President and Chief Executive Officer.  Until June 10, 2005, Perkins was the Senior Vice President of Store Development.  Until May 3, 2005, Baumberger was President of "Game Crazy," a division of Hollywood.

During 1999 and 2000, certain Hollywood executives, including Ekman, worked with the law firm of  Fried, Frank, Harris, Shriver and Jacobson ("Fried Frank") to develop a change of control plan.   Hollywood received numerous memoranda, proposals and draft individual severance agreements during that time period.  Plaintiffs allege that in the process of formulating and finally adopting the change of control plan at issue here, the Board of Directors considered and relied on one particular memorandum prepared by Fried Frank and provided to Hollywood on or about December 3, 1999 ("FF Memo").

The FF Memo[2] provided that, upon a qualifying termination or resignation, the covered executives would be paid severance as follows:  a lump sum cash payment equal to two times the sum of annual base salary and bonus, and continuation of health benefits for two years.  See Ex. 2 to Ekman Decl.  Further, the FF Memo specified that the bonus would be the target annual bonus for the year in which the change of control takes place or in which the termination occurs,

---

[2]Fried Frank provided three drafts of the FF Memo to Hollywood between December 3, 1999, and January 6, 2000.  See Ex. 2, 3, 4 to Rothenberg Decl.  Each draft of the FF Memo was accompanied by other draft materials relating to the severance plan.  Most of the key provisions remained the same in the various drafts of the memo provided by Fried Frank to Hollywood.

or the highest annual bonus in the previous three fiscal years ending immediately prior to the date of change in control, whichever is greater.  Id.  The FF Memo also contained a "gross up" provision such that any severance payments would be augmented to ensure that each executive would receive an after-tax amount equal to the amount he would have received in the absence of taxes.  Id.  Plaintiffs contend that the Board members who voted to approve the change of control plan in July 2000 intended to adopt all of the terms set out in the FF Memo.  Defendants disagree.

Fried Frank also provided drafts of severance agreements for individual executives.  One Fried Frank draft  provided to Hollywood on July 21, 2000, contained a provision that would have treated any severance obligation as subject to a "modified cap" rather than a pure "gross up."[3]  Hollywood never executed individual severance agreements with any of the plaintiffs.

On July 26, 2000, Hollywood's Board of Directors, which included Ekman, passed a Change of Control Resolution ("the Resolution") adopting a Change of Control Plan ("COC Plan") that provided for severance payments to certain Hollywood executives upon a change in ownership or control of the company and the subsequent termination or resignation of those executives.  The Resolution included an attachment labeled Exhibit A that was entitled "Change of Control Plan for Senior Management" and was in the form of an outline.  Exhibit A contained language that described severance payments to which Hollywood executives would be entitled,

---

[3]Unlike a gross up which is designed to completely negate the effect of taxes, a modified cap provides for the executive's severance payments to be potentially reduced to a level lower than they otherwise would be.  This is done in order to avoid triggering the excise tax that applies to severance benefits over a certain threshold.  A modified cap recognizes that depending on the amount of the severance benefits, an executive may be better off paying the excise tax, but in other circumstances may be better off receiving a smaller severance payment in order to avoid triggering the excise tax.

PAGE 5 - FINDINGS AND RECOMMENDATION

including "2 years of base pay together with bonus and medical premiums if within 2 years of the Change of Control the (i) officer's employment is terminated for any reason, other than for Cause (as defined herein) or (ii) the officer resigns for Good Reason (as defined herein)."  See Ex. 1 to Ekman Decl.  The FF Memo was not mentioned in either Exhibit A or in the Board's Resolution.  The minutes of the Board meeting on July 26, 2000, which were prepared and signed by Ekman, also fail to mention the FF Memo.  See Ex. 2 to Todd Decl.

On April 27, 2005, Hollywood merged with a subsidiary of Movie Gallery and became a wholly-owned subsidiary of Movie Gallery.  The merger effected a "change of control" as contemplated by the Resolution.  The Merger Agreement referenced the COC Plan and included an attachment numbered Annex 4.26(a) which is substantively identical to the document adopted by Hollywood's Board as Exhibit A.  The Fried Frank Memo was not mentioned anywhere in the Merger Agreement.

As part of the merger, Hollywood terminated the employment of the Baumberger plaintiffs.  On June 1, 2005, Hollywood General Counsel Page Todd sent a memo to the Baumberger plaintiffs advising them that the terms of the Resolution were ambiguous, and that he had been unable to ascertain the intent of the Board in passing the Resolution.  Todd advised the Baumberger plaintiffs that Hollywood would therefore pay the severance benefits over a two-year period on a regular payday basis.  Hollywood has continued to pay the Baumberger plaintiffs on a regular payday basis, but has paid neither the lump sum bonus or prorated bonus as described in the FF Memo.  Hollywood initially failed to pay health insurance premiums for the Baumberger plaintiffs, but began to do so sometime in 2006 and has reimbursed plaintiffs for premiums they paid out-of-pocket.

PAGE 6 - FINDINGS AND RECOMMENDATION

After Hollywood was acquired by Movie Gallery, Malugen and another Movie Gallery executive, Thomas Johnson ("Johnson"), met with Perkins to inform him that Perkins would be terminated by Hollywood in the future, and to discuss Perkins' benefits under the COC Plan. Perkins alleges that Malugen and Johnson told Perkins that they would make sure he received his compensation under the COC Plan, and that Perkins had the choice of taking a lump sum payment or being paid over two years. Perkins continued to work for Hollywood after the change in control to assist with the transition, allegedly in reliance on the promise of a lump sum payment. Perkins further alleges that Johnson confirmed the promise of a lump sum payment in a subsequent phone conversation with Perkins at which time Perkins indicated he wanted the severance benefits in a lump sum. Perkins continued to work for Hollywood until June 10, 2005. Since termination, Perkins has received his severance payments on a monthly basis with full payment to be completed in two years.

ANALYSIS

ERISA

As an initial matter this court must decide whether the severance plan at issue is subject to ERISA. Although there was initial disagreement, the parties apparently now agree that the plan is governed by ERISA.[4] For the following reasons, this court finds that Hollywood's Change of Control Plan in this action is subject to ERISA.

Severance plans for payment of employee benefits that operate only upon termination of employment are employee welfare benefit plans and within the scope of ERISA. Massachusetts

---

[4]Hollywood's Motion to Dismiss Plaintiffs' State Law Claims (No. 74), filed in June 2006, relies on a finding that the severance plan is covered by ERISA.

PAGE 7 - FINDINGS AND RECOMMENDATION

v. Morash, 490 U.S. 107, 116 (1989). A severance plan is subject to ERISA if it requires an "ongoing administrative scheme." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 18 (1987). Under Ninth Circuit law, a severance plan has an "ongoing administrative scheme" where the plan covers more than one employee and the circumstances of each employee's termination must be analyzed separately in light of certain criteria to determine whether the employee was entitled to benefits. See Bogue v. Ampex Corp., 976 F.2d 1319, 1323 (9th Cir. 1992), cert. denied, 507 U.S. 1031 (1993).

    As for the actual written documents, "ERISA requires only that an employee benefit plan be established and maintained by a 'written document'" and need not be formally labeled as such. Horn v. Berdon, Inc. Defined Benefit Pension Plan, 938 F.2d 125, 127 (9th Cir. 1991), citing 29 U.S.C. § 1102(a)(1). Even in the absence of a single written document, an ERISA plan may exist if a reasonable person viewing all the facts and circumstances could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. Cinelli v. Security Pacific Corp., 61 F.3d 1437, 1442 (9th Cir. 1995), citing Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982). While the intent to create a plan is not enough to establish the existence of an ERISA plan, even an employer's oral agreement to provide benefits could create an ERISA plan. Cinelli, 61 F.3d at 1443 (citations omitted).

    In this case, the COC Plan, which includes the Board's Resolution and Exhibit A,[5] represents a severance plan that includes an administrative scheme and requires discretionary

---

[5]The court notes Hollywood's arguments in its Supplemental Memorandum in Opposition to Summary Judgment that material issues of fact exist as to what documents constitute the COC Plan. However, even a plan with ambiguous terms may be subject to ERISA. Richardson v. Pension Plan of Bethlehem Steel, 112 F.3d 982, 985 (9th Cir. 1997).

PAGE 8 - FINDINGS AND RECOMMENDATION

decisionmaking such that each plaintiff's termination required Hollywood to make an individual

determination as to eligibility under the COC Plan.  Exhibit A to the Resolution, for example,

requires Hollywood to determine whether a terminated employee has met certain provisions of

the plan, e.g. termination for "cause", and resignation for "good reason" as defined in Exhibit A.

Hollywood represented to its executive employees and to the outside world that it had a COC

Plan for its senior executives that would provide them with certain severance benefits.  Key

executives knew that they were covered by the COC Plan, and expected to receive those benefits

upon a change of control at Hollywood.  While the meaning of specific provisions of the COC

Plan are in dispute, the plan as a whole is subject to ERISA.[6]

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to

any employee benefit plan" governed by ERISA.  29 U.S.C. § 1144(a).  A state law "relates to"

an employee benefit plan for purposes of ERISA "if it has a connection with or reference to such

a plan."  Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983).  The practical effect of

ERISA preemption is that a state law may "relate" to an employee benefit plan for purposes of

ERISA even if the state law "is not specifically designed to affect such plans, or the effect is only

indirect."  Bast v. Prudential Ins. Co. of America, 150 F.3d 1003, 1007 (9th Cir. 1998), cert.

denied, 528 U.S. 870 (1999) (citation omitted).  Under Ninth Circuit law, ERISA preemption

applies equally to statutory and common law causes of action.  Gibson v. Prudential Ins. Co. of

---

[6]The court notes the dispute between the parties as to whether the FF Memo was a
summary plan document ("SPD") under ERISA.  See 29 U.S.C. § 1022(a).  Under the law of this
circuit, because the FF Memo does not contain all of the formal requirements set forth by statute,
29 U.S.C. § 1022(b), the FF Memo cannot be an SPD under ERISA and cannot be used to
challenge the terms of the ERISA plan at this point.  Pisciotta v. Teledyne Industries, Inc., 91
F.3d  1326, 1329-30 (9th Cir. 1996).

PAGE 9 - FINDINGS AND RECOMMENDATION

America, 915 F.2d 414, 416 (9th Cir. 1990). Where a state law contract or tort claim would not have arisen "but for" the alleged violation of an ERISA plan and the claim is "inextricably intertwined with the plan's decision not to pay", the claim is preempted as an "alternative enforcement mechanism." Dishman v. UNUM Life Ins. Co. of America, 269 F.3d 974, 983 (9th Cir. 2001).

Here, all plaintiffs have conceded that their state and common law claims, pled in the alternative, are preempted if ERISA applies, with the exception of Perkins' claim for accrued vacation wages which will be addressed below. See Tingley v. Pixley-Richards West, Inc., 953 F.2d 1124, 1131 (9th Cir. 1992) (state law claims for breach of contract, breach of covenant of good faith and fair dealing, and intentional interference with contractual relations preempted by ERISA).

Because this court finds that the COC Plan is subject to ERISA and that all but one of plaintiffs' state and common law claims are preempted by ERISA, Hollywood's Motion to Dismiss State Law Claims should be granted. Hollywood's Motion for Summary Judgment on Perkins' common law claim for tortious interference with economic relations should be denied as moot. Perkins' demand for punitive damages should also be stricken because punitive damages are not recoverable under ERISA. See Aetna Health, Inc. v. Davila, 542 U.S. 200, 215 (2004). Also, Perkins' demand for jury trial should be stricken because ERISA does not provide a right to trial by jury. See Thomas v. Oregon Fruit Products Co., 228 F.3d 991, 995 (9th Cir. 2000).

Perkins' Claim for Nonpayment of Accrued Vacation

Perkins alleges a claim for accrued vacation wages under ORS 652.140. The payment of vacation benefits is a "payroll practice" not covered by ERISA. See Morash, 490 U.S. at 115,

120.  Perkins alleges that at the time his employment with Hollywood was terminated, he had accrued vacation time.  He further alleges that Hollywood's practice was that accrued vacation was paid out upon termination of employment, and that Hollywood willfully failed to pay him all vacation wages that were due upon his termination.  He claims those wages became due on June 13, 2005, and that he was not paid until June 27, 2005, just two weeks later.  Due to this alleged failure to immediately pay vacation wages, Perkins contends that he is entitled to an additional fourteen days of penalty wages under ORS 652.150, totaling $9,589.04, and interest.

Oregon law does not require employers to pay out accrued but unused vacation time upon termination of an employee.  Hollywood argues that its corporate policy does not provide for pay out of unused vacation time upon termination of employment except where such payment is required by state law, and supports this statement with a declaration and a copy of Hollywood's "Vacation Pay" policy.  See Ex. 1 to Howard Decl. in Support of Defendants' Motion for Summary Judgment.  Perkins agrees that Oregon law does not require employers to pay out accrued but unused vacation time upon termination, but argues that the document provided by Hollywood as to its vacation pay policy "does not state that it applies to executive-level officers at Hollywood."

ORS 652.140 provides that upon termination of employment, "all wages earned and unpaid at the time of the discharge or termination become due and payable not later than the end of the first business day after the discharge or termination."  However, Hollywood had no legal obligation to pay Perkins for his unused vacation time.  Perkins alleges that it was Hollywood's practice to pay out unused vacation time upon termination of employment, but that is directly contradicted by Hollywood's vacation pay policy.  Perkins contends that Hollywood's written

PAGE 11 - FINDINGS AND RECOMMENDATION

policy as to pay out of vacation time did not apply to executive-level officers but he offers no

evidence beyond his assertion to support this argument.  Finally, Perkins relies on a one-line,

internal Hollywood email, dated June 25, 2005, for his argument that Hollywood believed it was

required to pay his accrued vacation.  That email said:  "We do need to pay Mark [Perkins] the

vacation, and then keep on paying him normally." Ex. 7 to Tormala Decl.  Without more support,

however, this statement does not raise a question of fact as to any legal obligation on

Hollywood's part, but rather signifies that a decision was made on an individual basis to pay out

Perkins' vacation time based on his service to the company at a time of transition.  See Howard

Decl. at 2.  The fact that Hollywood did pay Perkins $8,653.82 in unused vacation time was a

gratuitous act and does not create any legal obligation such that Perkins is entitled to penalty

wages under Oregon law.  Hollywood's Motion for Summary Judgment on Perkins' claim for

violation of state wage law based on nonpayment of accrued vacation should be granted.

Disputed Issues of Material Fact

        At the heart of plaintiffs' motion for summary judgment is the question of whether

Hollywood's Board of Directors intended the FF Memo to be part of the COC Plan when they

adopted the Resolution and Exhibit A on July 26, 2000.  Plaintiffs argue that the former

Hollywood Board members intended to provide a lump sum payment of salary with prorated

bonus and a gross up feature to the plaintiff executives as set forth in the FF Memo.  Hollywood

argues that there was no mention of the FF Memo in the Resolution, Exhibit A or the Board

minutes from the July 26 meeting and that the question of whether the terms contained in the FF

Memo were made part of the COC Plan is a disputed issue of material fact.  Because the terms of

the COC Plan can not be interpreted without resorting to extrinsic evidence and reliance on the

PAGE 12 - FINDINGS AND RECOMMENDATION

subjective intent of the contracting parties at the time the Resolution was adopted, this court recommends denying plaintiffs' motion for summary judgment.

Under Federal Rule of Civil Procedure 56(c), the party seeking summary judgment bears the burden of demonstrating that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When a contract provision is ambiguous and resort to extrinsic evidence is necessary, "ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact."  Maffei v. Northern Ins. Co. of New York, 12 F.3d 892, 898 (9th Cir. 1993) (citation omitted); see also National Basketball Ass'n v. SDC Basketball Club, Inc., 815 F.2d 562, 569 (9th Cir. 1987) (summary judgment was precluded by genuine issues of material fact as to basketball league and franchise's intent concerning franchises' movement); United States v. Sacramento Mun. Util. Dist., 652 F.2d 1341, 1344 (9th Cir. 1981) (summary judgment ordinarily improper where contract unclear because differing views of parties' intent raises genuine issues of material fact) (citation omitted).

The Resolution adopted by the Board obligates Hollywood to pay the plaintiffs two years' salary and a bonus, however the timing and calculation of payment are not clear.  A contract term is ambiguous if it is subject to reasonable alternative interpretations.  Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3rd Cir. 1991).  Hollywood argues that the plan language should be interpreted as authorizing payment of promised salary on a regular payday schedule.  Plaintiffs argue that where contract terms are susceptible to more than one interpretation, the court may look to extrinsic evidence to determine the intent of the parties.  Three Hollywood board members, Scott Beck, William Zebe, and Don Ekman, testified

PAGE 13 - FINDINGS AND RECOMMENDATION

in their declarations that their intent was to rely on the FF Memo to "be part of" the Resolution or considered it to be "part of the Plan."

Plaintiffs point to Richardson v. Pension Plan of Bethlehem Steel Corp., 112 F.3d 982 (9th Cir. 1997), for their argument that the COC Plan is an ERISA plan with ambiguous terms that requires resort to extrinsic evidence to determine the intent of the Board in adopting the plan.[7] In Richardson, the extrinsic evidence was deposition testimony of union negotiators who had helped draft specific provisions for a written Memorandum of Settlement between the employer and employees. Here, the issue is much broader. Whether the FF Memo was before the Board when it adopted the COC Plan and the extent to which the provisions of that memo were incorporated into that plan raise material issues of fact that are not resolved by resort to extrinsic evidence, and, thus, are not susceptible to summary judgment. As previously discussed, there is no mention of the FF Memo in the Resolution, Exhibit A, or the minutes of the Board meeting, and the Resolution and minutes refer to Exhibit A as "the plan", casting doubt on whether the Board intended to adopt the terms of the FF Memo. Also, Hollywood's interpretation of the COC Plan as providing severance pay over the course of two years was a reasonable interpretation. Because the declarations of three board members do not resolve all questions of fact relating to the Board's intent, summary judgment on this issue is not appropriate.

---

[7]Plaintiffs also point to two cases from the Third Circuit but neither was decided on facts similar to this case. Barker v. Ceridian Corp., 193 F.3d 976 (3rd Cir. 1999) (reversing a district court opinion that failed to consider testimony as to the effect of a provision in a summary plan document that conflicted with the plan); Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227 (3rd Cir. 1991) (reversing summary judgment and finding that the plan and another related policy were sufficiently ambiguous to create triable issues of fact).

PAGE 14 - FINDINGS AND RECOMMENDATION

The record shows that the FF Memo was a work in progress as opposed to a final iteration as plaintiffs argue.  In fact, Fried Frank provided three versions of the FF Memo to Hollywood between December 3, 1999, and January 6, 2000.  See Ex. 2, 3, 4 to Rothenberg Decl.  Fried Frank also provided other documents to Hollywood including a draft severance plan on July 21, 2000, just days before the Board meeting, in which the "gross up" provision had been removed and a "modified cap" provision had been substituted.  See Ex. 6 at 11 to Rothenberg Decl.  Plaintiff Ekman's deposition further confuses the issue of whether the precise FF Memo was before the Board when they adopted the COC Plan.  Ekman testified that the Board actually adopted a different Fried Frank Memo on which Ekman made handwritten notations, marking up and crossing out various sections to reflect which terms the Board did not intend to adopt.[8]  These multiple questions of fact regarding what precise document was before the Board when it adopted the COC Plan make summary judgment inappropriate.

The manner in which the FF Memo was presented to Hollywood also raises an issue of material fact.  The FF Memo was not a single document but part of a package of draft materials provided to Hollywood on or about December 3, 1999.  That package included individual severance agreements proposed by Fried Frank to effectuate individualized change-of-control protection.  Hollywood argues that the FF Memo on which plaintiffs rely was only a draft, and was revised twice between December 3 and the Board meeting in July 2000.  Plaintiffs respond that all versions of the FF Memo and other documents provided by Fried Frank to Hollywood contained the same key provisions that provided for a lump sum payment; payment of the highest bonus the executive had received in the previous three years; and a gross up provision.

_____

[8]Ekman Dep. 34:9-35:23, 84:4-86:17, 273:22-278:8.

PAGE 15 - FINDINGS AND RECOMMENDATION

However, the draft severance plan that Fried Frank sent to Hollywood on July 21, 2000, included a modified cap as opposed to a gross up provision.  Because the FF Memo was not specifically included in the COC Plan when the Board adopted the Resolution, this court cannot conclude that all the various document drafts provided to Hollywood by Fried Frank demonstrate an ongoing intent to include the contract provisions most favorable to plaintiffs.

Finally, the actions of plaintiff Ekman subsequent to the July 2000 Board meeting also create issues of material fact relating to the intent of the Board in adopting the COC Plan.  While Ekman asserts that he specifically recalls intending to adopt the terms of the FF Memo in July 2000, Ekman drafted individual severance agreements for Giesbrecht and himself in April and May 2005 before leaving Hollywood.  Neither of the drafts included a gross up provision, and the drafts, which were never finalized, took conflicting positions regarding whether severance should be paid over time or in a lump sum.  Plaintiffs argue that because these documents were prepared by Ekman at the behest of Hollywood, and because neither document was finalized, the documents do not undermine plaintiffs' position as to Ekman's intent at the time of the Board meeting in July 2000.  This reasoning is not persuasive.  Ekman's preparation of these individual severance agreements in 2005, which contained significantly different terms than the FF Memo, casts doubt on his assertions as to the intent of the Board in adopting the COC Plan in July 2000.

Because this court finds that genuine issues of material fact exist as to whether the FF Memo was adopted by the Hollywood Board of Directors as part of Hollywood's Change of Control Plan on July 26, 2000, plaintiffs' Motion for Summary Judgment should be denied.

///

///

PAGE 16 - FINDINGS AND RECOMMENDATION

CONCLUSION

For the reasons set forth above, this court recommends denying plaintiffs' Motion for Summary Judgment (No. 18), granting defendants' Motion to Dismiss State Law Claims and Strike Perkins' Demands for Punitive Damages and Jury Trial (No. 74), and granting defendants' Motion for Summary Judgment on Perkins' Claim for Violation of State Wage Law for failure to pay accrued vacation wages (No. 76).  Having granted defendants' Motion to Dismiss State Law Claims and defendants' Motion for Summary Judgment, Perkins' claim for tortious interference with economic relations should be denied as moot.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due November 1, 2006.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 17th day of October, 2006.


 /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge


PAGE 17 - FINDINGS AND RECOMMENDATION